UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                     CASE NO. 8:24-cr-429-CEH-CPT

SLAWOMIR WINIEWSKI,
WIESLAW ROBERT RUTA, and
PIOTR MAREK ADAMCZYK


**UNITED STATES' RESPONSE TO DEFENDANTS'**
**MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through the undersigned counsel, and
hereby responds in opposition to defendants' motion to suppress evidence seized by the
Coast Guard during its search of the sailing vessel NICOLLET. Doc. 40.

Defendants fail to specify any controlling law to support suppression of the
evidence in this case. The Coast Guard complied with applicable law and
international norms when it stopped, boarded, and searched the NICOLLET.
Defendants either hang their arguments on non-binding law or misapply
controlling law in an effort to persuade this Court that the Coast Guard's actions
were anything other than what they truly were – lawful and reasonable. The
Court should deny the defendant's motion.

**SUMMARY OF FACTS**

The defendants are charged in a two-count indictment with possession, and
conspiracy to possess, with intent to distribute five kilograms or more of a mixture or

substance containing a detectable amount of cocaine, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501, *et seq.* These charges arose out of a September 20, 2024, interdiction by the U.S. Coast Guard Cutter RESOLUTE of the NICOLLET, a 46-foot Poland flagged sailing vessel, in the international waters of the Caribbean Sea, approximately 197 nautical miles north of Barranquilla, Colombia. The defendants, Slawomir Winiewski, Wieslaw Robert Ruta, and Piotr Marek Adamczyk, were the three (3) crewmembers of the NICOLLET. All three defendants are citizens of Poland and have no voluntary connection to the United States.

On September 19, 2024, the Coast Guard initially encountered the NICOLLET, in international waters. The Coast Guard Cutter RESOLUTE plotted a course to intercept the vessel. Given the time of day and minimal light, the Coast Guard observed the NICOLLET overnight and decided to conduct a right of approach the following morning. On September 20, 2024, the RESOLUTE boarding team conducted right of approach questioning to determine and verify the nationality of the NICOLLET. During the right of approach questioning, defendant, Slawomir Winiewski, identified himself as the master of the vessel and made a verbal claim of Polish nationality for the vessel. The vessel was also flying a Polish flag. Winiewski stated that the vessel left from Panama on September 14, 2024, and was heading to Martinque to fix a steering problem. During this questioning, the RESOLUTE boarding team noted rub marks along the hull of the vessel, extra fuel on board, and a path of travel that did not coincide with the master's statements.

Based on the claims of Polish nationality and pursuant to Article 17 of the United

Nations Convention Against Illicit Traffic of Narcotic Drugs and Psychotropic Substances of 1988, the United States contacted the Government of Poland and requested confirmation of the NICOLLET's registry and nationality. While waiting for a response from Poland, the RESOLUTE remained near the NICOLLET. At approximately 6:00 p.m. the same day, Polish authorities notified the RESOLUTE that the NICOLLET was not located in Poland's vessel registry. *See Exhibit A.* As such, the RESOLUTE was granted a Statement of No Objection to conduct a right of visit boarding. The RESOLUTE boarding team gathered the vessel's documents, including the purported registration and passports of the crewmembers, in an effort to verify the vessel's registration and crew's identities. The Coast Guard verified the NICOLLET was not registered with Poland and therefore was authorized to treat the NICOLLET as a vessel without nationality. The RESOLUTE boarding team then proceeded to conduct a full law enforcement boarding. During this board, RESOLUTE boarding team located and seized approximately 743 kilograms of cocaine.

On September 27, 2024, United States Magistrate Judge Daniel Irick signed a criminal complaint charging all three of the defendants. That same day, federal arrest warrants were issued for all defendants. On September 30, 2024, all three defendants were brought ashore in Miami, Florida, processed through immigration authorities, and flown directly to Tampa Florida where they were arrested pursuant to the previously issued arrest warrants. The defendants physically arrived in Tampa after five o'clock P.M. on September 30, 2024. After arriving in Tampa, all three defendants were promptly processed by federal agents. The following day, all three defendants made their

initial appearances.

**ARGUMENT**

Citing the Fourth Amendment to the United States Constitution, the defendants ask this Court to suppress the approximately 743 kilograms of cocaine seized from the NICOLLET. As the basis for this request, the defendants claim (1) that the Coast Guard did not have reasonable suspicion to board and search the NICOLLET, and (2) that the defendants were excessively detained following the search of the vessel and seizure of the cocaine found onboard. Notably, the defendants do not challenge the validity of the search itself as a basis for suppression, only the legality of the initial boarding of the vessel.

These arguments are wrong. First, the NICOLLET was properly treated as a vessel without nationality because the purported flag-state unequivocally **<u>denied</u>** registration of the vessel. Second, he defendants, foreign nationals with no voluntary connection to the United States, cannot claim the protection of the Fourth Amendment in connection with the boarding and search of a foreign-flagged vessel in international waters. Third, the defendants have not and cannot establish a legitimate and reasonable expectation of privacy, and thus Fourth Amendment standing, as to the areas of the vessel where the cocaine was found and even if the Fourth Amendment did apply to the defendants in this context, the boarding and subsequent search of the vessel were constitutionally reasonable because the purported flag-state **<u>denied</u>** registration of the vessel. Fourth, the conduct proscribed by the MDLEA need not have a nexus to the United States. Fifth, although not required for the boarding and search in this case, the

Coast Guard did have statutory authority and reasonable suspicion at the time of the boarding.

1. **The Coast Guard properly treated the NICOLLET as a vessel without nationality**

Defendants make a two-part argument on the nationality of the NICOLLET. First, they assert that the Coast Guard did not contact the proper Polish entity as it relates to the registry of the NICOLLET. Second, they claim that since the Polish Yachting Association was not directly contacted, the Coast Guard "violated international law." Both arguments fail.

Congress enacted the MDLEA to combat the illegal drug trade, permitting the prosecution of maritime drug trafficking. *United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014); 46 U.S.C. § 70503(a)(1). The MDLEA provides the framework used to determine if a vessel is subject to the jurisdiction of the United States. 46 U.S.C. § 70502(C). Specifically, the MEDLEA provides that "a vessel without nationality" is a vessel subject to the jurisdiction of the United States. *Id.* The MDLEA expands to define situations in which a vessel would be defined as one without nationality, to include "a vessel abord which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C) (emphasis added).

In this case, it is undisputed defendant Winiewski claimed to be the master of the NICOLLET and claimed Polish nationality for the NICOLLET. It is also undisputed that the United States contacted Poland and Poland responded to the United States'

inquiry as to the registration of the NICOLLET unambiguously **denying** registration of the vessel in Poland. As such, the NICOLLET was properly treated as a vessel without nationality, and therefore subject to the jurisdiction of the United States. Defendants repeatedly assert in their motion that they had a "valid registration" for the NICOLLET but fail to provide any evidence to confirm the validity of the registration. Rather, the only evidence in this case regarding the registration document directly rebuffs its validity.

Defendants assert the United States violated "international maritime law" because the Coast Guard did not contact the Polish Yachting Association. This too is a defective argument, unsupported by both the facts of this case and the applicable law. "A person charged with a violation of the MDLEA 'does not have standing to raise a claim of failure to comply with international law as a basis for a defense.'" 46 U.S.C. § 70505; *United States v. Hernandez*, 864 F.2d 1292, 1301 (11th Cir. 2017). Furthermore, "MDLEA statelessness does not turn on actual statelessness, but rather on the response of the foreign government." *Id.* at 1299. In other words, the statelessness determination is not dependent upon whether the information provided by the foreign government is accurate. *Id.* "The very concept of a conclusive proof entails not only that no detail or corroboration is needed, but also that any contrary evidence is futile." *Id.* at 1300. The response of a foreign nation to a claim of registry is proved conclusively by certification of the United States Secretary of State or the Secretary's designee. 46 U.S.C. § 70502(d)(2). The Department of State Certification as it relates to this case is dated October 17, 2024, and filed at docket entry 50. For all these reasons, defendants'

arguments that the NICOLLET was not subject to the jurisdiction of the United States and that the United States "violated international law" must fail.

### 2. The Fourth Amendment does not apply to the defendants

The defendants cannot challenge the constitutionality of the boarding and search of the NICOLLET or invoke the exclusionary rule "because the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country." *United States v. Cabezas-Montano*, Case No. 17-14294, 2020 WL 486781, at \*15 (11th Cir. Jan. 30, 2020), citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990) (holding that the Fourth Amendment protects only "the people" of the United States and has no application to search-and-seizure challenges where the challenger is a non-citizen/non-resident alien with no voluntary attachment to the United States and the area searched is located outside of the United States). In *United States v. Verdugo-Urquidez*, 494 U.S. 259, 267 (1990), the United States Supreme Court ruled that the Fourth Amendment does not apply to activities of the United States directed against aliens in foreign territory or in international waters. The Court reasoned that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own government rather than to restrain the actions of the federal government against aliens outside United States territory. *Id.* at 265-66. The Eleventh Circuit has repeatedly applied *Verdugo-Urquidez* in MDLEA cases, holding that the Fourth Amendment does not apply to the search or seizure of a foreign vessel with an alien crew in international waters. *United States v. Emmanuel*, 565 F.3d 1324, 1332 (11th Cir. 2009); *United States v.*

*Cabezas-Montano*, 17-14294, 2020 WL 486781, at *15, 16 (11th Cir. Jan. 30, 2020); *United States v. Hurtado*, 89 F.4th 881, 895 (11th Cir. 2023).[1]

The Eleventh Circuit, in a recent published and therefore binding opinion, directly applied *Verdugo-Urquidez* in the MDLEA context holding that "the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien <u>arrested in international waters or a foreign country</u>." *United States v. Cabezas-Montano*, 17-14294, 2020 WL 486781, at *15, 16 (11th Cir. Jan. 30, 2020) ("under the MDLEA, we too must follow *Verdugo-Urquidez* and conclude that [the defendant], who is a non-U.S. citizen and non-U.S. resident, and who has no significant connection to the United States, cannot challenge under the Fourth Amendment and *McLaughlin* the Coast Guard's conduct in taking 49 days on the high seas outside of the United States to transport him to Florida for presentment to the magistrate judge." In *Cabezas-Montano*, the Eleventh Circuit cited, with approval, its decision in *Emmanuel*, the First Circuit's decisions in *Vilches-Navarrete* and *Bravo*, and the Ninth Circuit's decision in *Zakharov*. *Id*. at *15.

While failing to cite the Supreme Court's decision in *Verdugo-Urquidez* or the Eleventh Circuit's decision in *Hurtado*, the defendants instead cite to non-binding opinions from the Fifth Circuit as in an attempt to invoke the exclusionary rule and protections of the Fourth Amendment in this case. This case contradicts *Verdugo-*

---

[1] In fact, several other circuits, including the First, Fifth, and Ninth, apply *Verdugo-Urquidez* in MDLEA cases, holding that the Fourth Amendment does not apply to the search or seizure of a foreign vessel with an alien crew in international waters. *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008); *United States v. Kurdyukov*, 48 Fed. Appx. 103 (5th Cir. 2002); and *United States v. Zakharov*, 468 F.3d 1171, 1179 (9th Cir. 2006)).

*Urquidez* and does not control.

Pursuant to *Hurtado, Cabezas-Montano,* and *Verdugo-Urquidez*, the defendants in this case cannot challenge the boarding and search of the NICOLLET pursuant to the Fourth Amendment. It is undisputed that all relevant United States law enforcement action took place against foreign nationals with no voluntary connection to the United States, in international waters, onboard a vessel whose purported flag-state **denied** the registration of the vessel – hence a vessel without nationality. Because the defendants cannot avail themselves of the protection of the Fourth Amendment (at least as it pertains to activities occurring onboard a foreign-flagged vessel or in international waters), there is no basis to suppress evidence or invoke the exclusionary rule which protects against Fourth Amendment violations. For that reason alone, the defendants' motion to suppress should be denied.

**3.       No Fourth Amendment Standing to Contest Search**

While the defendants' motion appears to focus on the legality of the initial boarding and subsequent detention, to the extent any of the defendants are challenging the legality of the actual search of the NICOLLET, they cannot establish Fourth Amendment standing to object to the search of the manufactured hidden compartments where the approximately 743 kilograms of cocaine were found. "The Supreme Court long has recognized that the Fourth Amendment's guarantee of freedom from warrantless searches and seizures is not premised on arcane concepts of property and possessory interests; instead, the Fourth Amendment protects an individual in those places where she can demonstrate a reasonable expectation of privacy against

government intrusion." *United States v. Cooper*, 203 F.3d 1279, 1283–84 (11th Cir. 2000) (citing *Katz v. United States,* 389 U.S. 347, 353 (1967)). "Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search." *Id*. (citing *Rakas v. Illinois,* 439 U.S. 128, 133–34, (1978)).

The Supreme Court has stated, "the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise illegitimate." *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). "To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). The requirement for a justifiable expectation of privacy is two-fold. *United States v. Lopez*, 761 F.2d 632, 635 (11th Cir.1985). In order to establish standing to challenge a search or seizure under the Fourth Amendment, defendants must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'" *Hudson*, 104 S.Ct. at 3199 (quoting *Katz v. United States*, 389 U.S. 347, 361, (1967) (Harlan, J., concurring)). The burden in establishing this right to contest the search is on each defendant challenging the search and subsequent seizure. *United States v. Payner*, 447 U.S. 727 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.").

Privacy interests at sea are frequently more restrictive than those applicable on

land. *United States v. Thompson*, 928 F.2d 1060, 1064 (11th Cir.1991) ("At sea, a person's expectation of privacy may be severely restricted compared with expectations of privacy on land.") Often, privacy interests on vessels are limited because Coast Guard officers may board a vessel without permission to conduct a safety and document search as well as gain access to all areas of a boat. *United States v. Lopez*, 761 F.2d 632, 635 (11th Cir. 1985). *see also, United States v. Herrera*, 711 F.2d 1546, 1553 (11th Cir. 1983).

Mere presence upon a vessel is insufficient to confer standing. *United States v. Sarda-Villa*, 760 F.2d 1232, 1236 (11th Cir. 1985). Furthermore, "[i]t is not sufficient, for example, that a sailor has the right to exclude others from a ship in order to have a legitimate expectation of privacy, because a Coast Guard officer may board without permission to conduct a safety and document search and gain access to all common areas of a boat." *Lopez*, 761 F.2d at 635. Courts have therefore held that "neither captain nor crew has a legitimate expectation of privacy ... in an area which is subject to the common access of those legitimately aboard the vessel." *United States v. Freeman,* 660 F.2d 1030, 1034 (5th Cir. 1981). Such common areas have been held to include cargo

holds[2], engine rooms[3], fuel tanks[4], and hidden spaces or secret compartments below deck.[5]

To the extent the defendants seek to challenge the validity of the search of the NICOLLET, the motion should be summarily denied on that basis as they have not alleged any facts demonstrating a legitimate expectation of privacy in the state room hidden compartments where the cocaine bales were secreted and eventually found by the Coast Guard. *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (district court correctly denied suppression motion without evidentiary hearing where motion "was deficient of any facts that might have demonstrated that they had a reasonable expectation of privacy" in hotel room where evidence found). The defendants may have

---

[2] *See United States v. Williams,* 617 F.2d 1063, 1093 (5th Cir.1980); *United States v. Thompson,* 928 F.2d 1060, 1084 (11th Cir.) (recognizing difference between private areas or footlockers versus cargo holds); *United States v. Alvarez-Mena,* 765 F.2d 1259, 1269 (5th Cir.1985); *United States v. Peterson,* 812 F.2d 486, 494 (9th Cir.1987) (crew has no privacy interest in cargo hold); *United States v. Cardona-Sandoval*, 6 F.3d 15, 22 (1st Cir. 1993) ("cargo hold is not within an area in which crew members could have a reasonable or legitimate privacy interest"); *United States v. Wright-Barker*, 784 F.2d 161, 176 (3d Cir. 1986) (crew member has no expectation of privacy in a ship's cargo hold, and therefore no right to challenge the legality of the search in that area); *United States v. Pinto-Mejia,* 720 F.2d 248, 255 (2d Cir.1983).

[3] *United States v. Stuart-Caballero,* 686 F.2d 890 (11th Cir.1982), *cert. denied,* 459 U.S. 1209 (1983).

[4] *United States v. Sarda-Villa*, 760 F.2d 1232, 1235 (11th Cir. 1985).

[5] *Lopez*, 761 F.2d at 636 ("We cannot imagine that society would recognize a reasonable expectation of privacy in the use of "dead space" in the hull of a ship, sealed with permanent fiberglass and painted to match the surrounding surfaces, for the legitimate storage of personal items."); *United States v. Sarda-Villa*, 760 F.2d 1232, 1237 (11th Cir. 1985); *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (no reasonable expectation of privacy in the secret compartment in which the drugs were found); *See also, Hudson v. Palmer*, 468 U.S. 517, 524 n. 7 (1984) ("Drug smugglers cannot assert standing solely on the basis that they hid the drugs well and hoped no one would find them").

gone to great lengths to hide the cocaine onboard the NICOLLET, but they cannot use those efforts to manufacture standing in this case. *Palmer*, 468 U.S at 524 (1984).

### 4.    The MDLEA does not require a nexus to the United States

Defendants argue the evidence seized during the searched of the NICOLLET must be suppressed because it lacked nexus to the United States. This argument directly contradicts binding Eleventh Circuit precedent.  While federal circuits may split on whether a nexus between criminal conduct under the MDLEA and the United States is required, the majority position – and, most importantly, the position taken by the Eleventh Circuit – requires no such nexus in MDLEA prosecutions. *See United States v. Stuart–Caballero,* 686 F.2d 890, 891 (11th Cir. 1982) (per curiam); *United States v. Suerte,* 291 F.3d 366, 375 (5th Cir. 2002); *United States v. Perez–Oviedo,* 281 F.3d 400, 402–03 (3d Cir. 2002); *United States v. Cardales,* 168 F.3d 548, 553 (1st Cir. 1999).

Neither the Eleventh Circuit nor most other circuits have "embellished the [MDLEA] with the requirement of a nexus between a defendant's criminal conduct and the United States." *United States v. Campbell*, 743 F.3d. 802, 810 (11th Cir. 2014) (citing *United States v. Estupinan*, 453 F.3d. 1336, 1338, n.2 (11th Cir. 2006). In fact, the principles of international law permit the exercise of a county's criminal law for several reasons, including the "protective principle." *United States v. MacAllister,* 160 F.3d 1304, 1308 (11th Cir. 1998). The protective principle permits a nation, in this case the United States, to assert jurisdiction over a person whose conduct outside the country threatens its security. *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1379 (11th Cir. 2011). The Eleventh Circuit has routinely held that "the conduct proscribed by the [MDLEA] need

not have a nexus to the United States because universal and protective principles support extraterritorial reach." *Campbell*, 743 F.3d at 810; *United States v. Crucikshank*, 837 F.3d 118, 1188 (11th Cir. 2016). No further inquiry is needed on this point.

**5.**      **The Coast Guard had reasonable suspicion to board and search**

Even if the defendants could avail themselves of the protection of the Fourth Amendment (which they cannot), the stop and boarding of the vessel would <u>still</u> be authorized under 14 U.S.C. § 89(a) and reasonable under the Fourth Amendment because the Coast Guard had reasonable suspicion that the NICOLLET was engaged in illegal activity. "[T]he Coast Guard may properly stop and board a foreign vessel in international waters under 14 U.S.C. § 89(a) if it has a reasonable suspicion that the vessel is engaged in smuggling contraband." *Reeh*, 780 F.2d at 1543–44; *Williams*, 617 F.2d at 1076. Whether the Coast Guard had reasonable suspicion must turn on the totality of the circumstances. *Reeh,* 780 F.2d at 1541. "Reasonable suspicion must be more than a mere hunch, yet it may be based on facts consistent with innocent conduct, and a law enforcement officer may assess the facts in light of his or her expertise in detecting smuggling." *United States v. Pearson*, 791 F.2d 867, 870 (11th Cir. 1986). Furthermore, "circumstances which would not seem the least bit suspicious to the casual observer may, to an officer, constitute grounds for reasonable suspicion." *Reeh*, 780 F.2d at 1544–45. Likewise, "circumstances which, considered individually, would not seem particularly suspicious even to an officer may justify reasonable suspicion when considered together." *Id*. at 1545. "Reasonable suspicion exists, moreover, if the cumulative information of which the detaining officer is aware suggests criminal

activity, even if each fact, viewed in isolation, can be given an innocent explanation."

*Tinoco*, 304 F.3d at 1116.

In this case, the Coast Guard was extremely conservative in establishing a legal basis to board and search the NICOLLET. The Coast Guard conducted a right of approach. Not only did they receive an overt denial of registration from the purported flag-state of Poland, the Coast Guard had reasonable suspicion, at the time of the boarding, to believe the vessel was engaged in illegal activity. The facts giving rise to such a suspicion include the following:

a. There were rub marks on the hull of the vessel.

b. There were extra fuel barrels on the deck of the vessel.

c. The vessel was transiting in a known drug trafficking area of the Caribbean Sea along a known trafficking route.

d. The vessel was on a course inconsistent with the master's claimed next port-of-call and instead on a course consistent with transporting drugs from South America to Central America.[6]

e. The master appeared to be the only individual on the vessel that had any sailing knowledge.

f. During the right of visit boarding, the Coast Guard observed the Hull Identification Number had been painted over.

---

[6] Defendants claimed, without citation, that since the wind was coming from the east, the NICOLLET could not sail east – the direction of Martinique, the claimed next port-of-call. This assertion is neither supported by any evidence nor consistent with the basic physics of sailing. A sailing vessel can sail at a "close haul" into the wind approximately 30 degrees. In other words, the NICOLLET could have efficiently sailed towards its destination if it altered course northeast to southeast. The RESOLUTE's logs indicated the wind was approximately 086 at the time of the right of approach, meaning an efficient trajectory for the NICOLLET to transit to Martinique would have been 116 – or only 36 degrees off due east. *Exhibit B.*

*See* "The Physics of Sailing," by Bryon D. Anderson published by NASA in Physics Today. https://gewa.gsfc.nasa.gov/clubs/sailing/RESOURCES/Physics_of_sailing.pdf

g. The master was not the owner of the vessel.

Taken together, the facts possessed by the Coast Guard constituted ample suspicion that the NICOLLET was involved in illegal activity. Given the totality of the circumstances and the Coast Guard's expertise in regulating commercial maritime vessels and combatting maritime drug smuggling, this suspicion was objectively reasonable. This conclusion is consistent with the vast majority of the cases where the Eleventh Circuit and other Circuits have upheld the boarding of a vessel based on reasonable suspicion.[7]

---

[7] *See, e.g.*, *United States v. Padilla-Martinez*, 762 F.2d 942, 950 (11th Cir. 1985) (vessel riding low in the water, flying no flag, carrying no cargo, and captain reportedly left the vessel several nights before to get engine parts); *United States v. Pearson*, 791 F.2d 867, 870 (11th Cir. 1986) (intelligence that smuggler was in area, vessel was dead in the water, rendezvous with smaller fishing vessel outside of fishing waters, neither vessel had running lights on); *United States v. Tinoco*, 304 F.3d 1088, 1116–17 (11th Cir. 2002) (unable to hail vessel by radio, vessel attempted to flee when small boat launched, observed jettison); *United States v. Reeh*, 780 F.2d 1541, 1545 (11th Cir. 1986) (permission to board denied in defensive manner, sailing vessel riding low in water, dirty waterline, proceeding on auxiliary power despite suitable weather for sailing); *United States v. Aguilar*, 286 Fed. Appx. 716, 722 (11th Cir. 2008) (vessel operating in known drug smuggling area, riding high in bow and low in stern, rub marks on side of vessel, vessel had directional finder antenna uncommon on merchant vessels, vague and evasive answers regarding cargo and next port of call); *United States v. DeWeese*, 632 F.2d 1267, 1271 (5th Cir. 1980) ("location of [vessel] coupled with the total absence of fishing activity created a 'reasonable suspicion' that [vessel] was on a narcotics run"); *United States v. Ruano*, 647 F.2d 577, 579 (5th Cir. 1981) (high rate of speed, early morning, vessels travelling together, only one person on each boat which was "inconsistent with people going out fishing."); *United States v. Davis*, 905 F.2d 245, 250 (9th Cir. 1990) (vessel listed as boat suspected of smuggling, unusual location, attempt to change course, riding low in water); *United States v. Green*, 671 F.2d 46, 54 (1st Cir. 1982) (vessel riding sluggishly, low in the water, took two hours to respond to Coast Guard's efforts to hail by radio, inconsistencies in claims of last port of call).

## CONCLUSION

For the reasons detailed above, the defendants' motion to suppress should be denied, and because the allegations raised in their motion are questions of law, it should be denied without an evidentiary hearing.

Respectfully submitted,

SARA C. SWEENEY
Acting United States Attorney

Ashley Haynes
Special Assistant United States Attorney
U.S. Attorney No. 216
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6125
Email:  Ashley.Haynes@usdoj.gov

**U.S. v. Winiewski, et al.**  Case No. 8:24-cr-429-CEH-CPT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Counsel of Record.

Ashley Haynes
Special Assistant United States Attorney
U.S. Attorney No. 216
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6125
Email:  Ashley.Haynes@usdoj.gov